1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                     **EASTERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| HARMEET SINGH KHAMBA, a.k.a. Gurjit SINGH<br><br>Petitioner,<br><br>v.<br><br>Sergio ALBARRAN, Acting Field Office Director of San Francisco Office of Detention and Removal, U.S. Immigrations and Customs Enforcement, et al.,<br><br>Respondents. | Case No. 1:25-CV-01227 JLT SKO<br><br>ORDER GRANTING PRELIMINARY INJUNCTION IN PART[1]<br><br>(Doc. 4) |

Harmeet Singh Khamba is a citizen and national of India who entered the United States under the name Gurjit Singh in 1994 on a visitor's visa.[2] (*See* Doc. 1-1 at 89.) He claims to have fled India for the United States because his family suffered persecution and torture there based on their religion, ethnicity, political opinion, and membership in a particular social group. (Doc. 1, ¶ 4.) The Petition indicates that Mr. Khamba's brother was killed for his political activities

---

[1] Upon the agreement of the parties, the Court converts the motion for temporary restraining order into one for preliminary injunction. Respondents had notice, opportunity to respond and be heard. Additional briefing is not required and the standard for a TRO and a preliminary injunction is the same. As such, given the nature of the relief granted by this order and to allow Respondents to appeal should they choose, the Court converts this to a Motion for Preliminary Injunction.

[2] Respondent contests Petitioner's assertion that he entered the United States lawfully but overstayed his visa. (Doc. 9 at 1.) Instead, Respondent points to filings in which Petitioner appears to have indicated that he entered the United States without inspection at or near San Ysidro, California on or about May 28, 1994. (Doc. 9-1 at 6 (Notice to Appear dated Feb. 19, 1998).) This dispute is not material to any of the legal issues presented in the TRO or the underlying habeas petition.

and that Mr. Khamba was arrested twice in India for reasons related to his brother's political activities.[3] (*Id*. at ¶ 4; *see also* Doc. 1-1 at 14.)

At some point in the 1990s[4], allegedly "through incorrect advice of his prior counsel," Mr. Khamba applied for asylum using a name other than his birth name. (Doc. 1, ¶ 37.) In February 1998, USCIS denied that application and referred his case to INA Section 240 proceedings in immigration court. (Doc. 9-1 at 6.) On June 22, 1999, an Immigration Judge denied Mr. Khamba's asylum application, as well as his requests for withholding of removal and Convention Against Torture relief. (Doc. 1-1 at 32.) The IJ found that Mr. Khamba failed to meet his burden of establishing credibility and statutory eligibility. (*Id*.) Respondent was granted voluntary departure to India and was released on a $500 voluntary departure bond. (*Id*.) The IJ's order indicated:

> Should respondent fail to post the voluntary departure. bond or should respondent fail to depart the United States within the period of time granted in this order, respondent's grant of voluntary departure shall automatically vacate and respondent will be ordered removed from the United States to India without further notice or proceeding.

(*Id*.)

The BIA subsequently affirmed the IJ on March 28, 2003, and Mr. Khamba filed a petition for review, which the Ninth Circuit ultimately remanded. (*See* Doc. 1-1 at 34–35 (BIA Appeal Decision reviewing procedural history.) On remand, the BIA affirmed the IJ again on May 16, 2005, and indicated that because Mr. Khamba failed to post his voluntary departure bond, he was ineligible for voluntary departure. (*Id*.) On January 24, 2007, Mr. Khamba was placed on an Order of Supervision (OSUP), which requires him to attend regular check in appointments at the ICE San Francisco Office, (*id*. at 5 (Form I-220B)[5]) and permits him to

---

[3] The record arguably contains information that calls these allegations into question. In 1999, as described herein, an immigration judge found Petitioner "failed to meet his burden of establishing credibility and statutory eligibility" for asylum. (Doc. 1-1 at 32.) In addition, Petitioner's wife told her psychologist that her former husband "died in an automobile accident in India." (*Id*. at 120.)

[4] The Petition indicates this application was filed in 1998, (*see* Doc. 1, ¶ 37), but Respondent's declarant indicates an application was filed in 1994. (Doc. 9-1, ¶ 7.)

[5] The Court takes judicial notice that, according to the U.S. Citizenship and Immigration Services website, this form

2

1    apply for work authorization. 8 C.F.R. § 241.5(c). Pursuant to 8 U.S.C. § 1231(a)(6)[6], which

2    provides DHS with discretion to release an alien subject to a removal order, immigration

3    officials necessarily determined that Mr. Khamba did not present a risk of flight or danger to the

4    community. *See also* 8 C.F.R. § 241.4(d)(1)(allowing for release if the alien "will not pose a

5    danger to the community or to the safety of other persons or to property or a significant risk of

6    flight pending such alien's removal from the United States").

7        In 2019, Mr. Khamba was arrested in Monterey County, California for what the Petition

8    describes as "disturbing the peace." (*See id.*, ¶ 39.)[7] Apart from that arrest, Petitioner has

9    complied with all the conditions and regularly applied for work authorization. (Doc. 1, ¶¶ 37–

10   38.) During this time, he has been living with his U.S. citizen wife and children, while starting a

11   successful auto repair business. (*Id.*, ¶ 38.) The Petition alleges that throughout this period,

12   Respondents have not been able to obtain a travel document from India for Petitioner enabling

13   ICE to remove him there. (*Id.*, ¶ 40.)

14       On August 5, 2025, Petitioner attended a check in appointment at the ICE San Jose

15   suboffice where he was given an ankle monitor to wear, apparently without being given any

16   reason why he needed electronic monitoring. (Doc. 1, ¶ 41.) He was told to appear for an

17   appointment on August 20, 2025, which he did. (*Id.*)

18       On August 29, 2025, ICE officers came to Petitioner's business in Carmel, California and

19   arrested him. (Doc. 1, ¶ 42.) Petitioner claims to have been given no specific explanation for his

20   arrest at that time. (Doc. 1, ¶ 1.) Records provided by Respondent indicate that the arresting

21   officer informed him generally that he had a warrant of arrest for immigration violations. (Doc. 9

---

is issued "to aliens who have a final order of removal but have not been removed from the United States." Available at https://www.uscis.gov/save/current-user-agencies/commonly-used-immigration-documents (last visited Sept. 3, 2025).

[6] 8 U.S.C. § 1231(a)(6) provides: "An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)."

[7] Notably, the underlying records indicates Mr. Khamba was initially charged with obstructing/resisting a public officer under California Penal Code (CPC) § 148(a)(1), though he ultimately plead no contest only to disturbing the peace under CPC § 415(2). (Doc. 1-1 at 137.)

1  at 13; *see also id.* at 17 (Warrant of Arrest indicating arrest was based on final order of removal
2  and 8 U.S.C. § 1182(a)(6)(A)(i)[8].) It is undisputed that Petitioner has not been provided any
3  post-deprivation interview pursuant to 8 C.F.R. § 241.13, which delineates the procedures to be
4  used when an order of release is revoked. (*See id.*) ICE eventually transferred Petitioner to the
5  Mesa Verde Detention Center located at 425 Golden State Avenue Bakersfield, California,
6  93301, where he remains detained. (*Id.*, ¶ 42.)

7  Mr. Khamba's wife has significant mental health challenges, with an onset of 2017 or
8  earlier. (Doc. 1-1 167–77 (Ex. H, Psychological Evaluation).) In 2024, she and Mr. Khamba lost
9  their twenty-year-old son in a motorcycle accident. (*Id.*) Since that time, she experienced a
10 severe mental health collapse including suicidal ideation. (*Id.*) She has been diagnosed with
11 severe Major Depressive Disorder, Panic Disorder, Insomnia Disorder, and Chronic Pain
12 Syndrome. (*Id.*) The psychologist who performed an evaluation of Mr. Khamba's wife stated
13 that if she lost her husband she would decompensate and likely re-experience suicidal ideation.
14 (*Id.*) Her physician states that since he was arrested, she "is depressed with severe heart pain."
15 (*Id.* at 179 (Ex. I).)

16 The record also indicates that Mr. Khamba's family is dependent on income from his auto
17 repair business, which he has operated for the past 14 years. (Doc. 1-1 at 52.) His 32-year-old
18 stepson Karan, a U.S. Citizen, works there also, as does Karan's U.S. Citizen spouse, and
19 another employee. (Doc. 1-1 at 111, ¶ 9; *see also* Doc. 1-1 at 76.) Mr. Khamba's wife states that
20 if "we lose the business, our savings will not allow us to continue to afford our mortgage
21 payment," though she does not explain why the business cannot operate in Petitioner's absence.
22 (Doc. 1-1 at 111, ¶ 9.)

23 On September 1, 2025, Mr. Khamba filed a motion to reopen removal proceedings with
24 the BIA, arguing that he will be eligible for adjustment of status based on his marriage. (Doc. 1-
25 1 at 43–55.)[9] As of the time of filing, the motion to reopen remains pending. (Doc. 1, ¶ 46.)

---

[8] 8 U.S.C. § 1182(a)(6)(A)(i) indicates: "An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible."

[9] The record indicates that Mr. Khamba's wife filed an I-130 petition on January 21, 2025. (Doc. 1-1 at 46, 58–60.)

      Mr. Khamba also filed a motion for a stay of removal with the BIA on September 2, 2025. (*See* Doc. 1-1 at 38.) Pursuant to policy, the BIA will only adjudicate a motion for stay if ICE confirms that it intends to imminently remove the noncitizen. *See* BIA Practice Manual Ch. 6.3(c)(2)(A)-(B), available at https://www.justice.gov/eoir/reference-materials/bia/chapter-6/3 (accessed Oct. 1, 2025). On September 5, 2025, counsel Mr. Khamba in connection with the motion for stay of removal contacted the BIA, which indicated that ICE had informed the BIA that ICE has no plans to remove Mr. Khamba. (Doc. 1-1 at 38, ¶ 7.)[10]

      Mr. Khamba requested the assistance of Congressman Jimmy Panetta. His office inquired as to why Mr. Khamba was arrested and ICE responded that Petitioner "has exhausted all legal remedies and will remain in ICE custody pending the issuance of travel documents and removal." (Doc. 1-1 at 38–39, ¶ 8.)

      The record also contains several letters from family members and members of the community. The following summary provides a representative sampling of those letters:

- A letter from retired Judge Stephen A. Sillman, who has known Mr. Khamba for over 20 years and describes Mr. Khamba as dedicated, hardworking, and concerned for his customers, as well as "one of the most generous, helpful, and kind individuals our family . . . has encountered." (Doc. 101 at 146–47.)
- A letter from Alfredo Abanico, a Marine Corps Veteran who has known Mr. Khamba for 30 years and supervised and worked with him in the auto repair business. Mr. Abanico describes Mr. Khamba as a "great American," who served as a mentor to junior technicians and who often worked into late into the night on his own time if necessary. Mr. Abanico believes Mr. Khamba should be "allow[ed] to stay in this country so that he can continue to instill his moral values, worth ethic and Loyalty to his children." (Doc. 1-1 at 148–49.)
- Letters from Suman Kaur and Kirpal Atwal who, among other things, describe Petitioner's charitable works. (Doc. 1-1 at 150, 156.)

---

[10] Mr. Khamba also attempted to file a Motion for Stay directly with ICE, but they would not accept it for filing. (Doc. 11 at 38, ¶ 6.) When counsel asked when they intended to remove Mr. Khamba, ICE refused to provide any information. (*Id.*)

5

1      • A letter from Rolando Becerra who worked with Mr. Khamba and states: "I came
2          from a poor neighborhood and had it not been for Harmeet taking me under his
3          wing, my life may have been very different. My family were immigrants like
4          Harmeet and he showed me how working hard and following the right path I could
5          succeed." (Doc. 1-1 at 155.)

6    On September 17, 2025, Mr. Khamba filed a petition for writ of habeas corpus alleging
7  that his detention constitutes a violation of the Fifth Amendment's right to substantive and
8  procedural due process. (Doc. 1, ¶¶ 121–30.) He also advances statutory, regulation-based, and
9  Administrative Procedure Act claims. (*Id.*, ¶¶ 131–145.) Finally, he asserts due process
10 challenges to any potential third country removal. (*Id.*, ¶¶ 146–154.) He seeks immediate release
11 from custody; declarations that his detention is unlawful on various grounds; an injunction
12 prohibiting his re-detention without a pre-deprivation custody hearing "before a neutral
13 adjudicator to determine whether his re-detention would be lawful because the government has
14 shown that he is now a danger or a flight risk and that his removal is reasonably foreseeable" and
15 at which "the neutral adjudicator must further consider whether, in lieu of detention, alternatives
16 to detention exist to mitigate any risk that DHS may establish"; and an order precluding his
17 removal to a third country without first being provided certain procedures. (*Id.* at 44–46.)

18    On the same day, Mr. Khamba also filed an ex parte motion for a temporary restraining
19 order. (Doc. 4.) In that motion, he seeks an order requiring "Respondents to release him from
20 custody, not re-detain him unless he is afforded notice and a hearing before a neutral adjudicator
21 on whether it is justified by clear and convincing evidence that he is a danger to the community or
22 a flight risk and that his removal is reasonably foreseeable, and refrain from removing him to any
23 third country without first providing him constitutionally-compliant procedures." (*Id.* at 34.)

24    Respondents oppose the issuance of preliminary injunctive relief and maintain that Mr.
25 Khamba may be detained because there are changed circumstances regarding the reasonable
26 foreseeability of his removal. (Doc. 9 at 2 (8 C.F.R. § 241.13(i)(2); 8 C.F.R. § 241.4(a)(1);
27 *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001) (explaining an alien can be detained "until it has
28 been determined that there is no significant likelihood of removal in the reasonably foreseeable

future").) It is undisputed that Mr. Khamba is subject to a final order of removal. Respondents now maintain that they expect to be able to obtain travel documents for Petitioner within the next 30 to 45 days, (*id.*), though they do not provide any further details about how that is possible. Though DHS indicates it has now submitted a travel document application to the Indian consulate in San Francisco, it submitted that request on September 16, 2025, (*see* Doc. 9-1, ¶ 19), several weeks after Mr. Khamba's arrest, and indicates—without evidentiary support—that the travel documents should issue in about a month. Respondents also contend that Mr. Khamba cannot demonstrate likelihood of success and that his brief detention of approximately one month "is not an irreparable harm." (Doc. 9 at 2.)

For the reasons set forth below, the Court converts the request for a temporary restraining order into a request for a preliminary injunction and **GRANTS** the motion in part.

## II. ANALYSIS

### A. Jurisdiction

#### 1. Habeas Corpus

Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of habeas corpus in which the petitioner asserts they are being held in custody "in violation of the Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

Petitioner seeks his immediate release from custody, which he contends violates the Constitution of the United States, the INA and applicable regulations, and the APA. (*See* Doc. 1.) Thus, Petitioner properly invokes the Court's habeas jurisdiction.

#### 2. Judicial Review under the INA

The Immigration and Nationality Act limits judicial review in many instances. Though 8 U.S.C § 1252(g), precludes this Court from exercising jurisdiction over the executive's decision to "commence proceedings, adjudicate cases, or execute removal orders against any alien," this Court has habeas jurisdiction over the issues raised here, namely the lawfulness of Petitioner's continued detention and the process required in relation to the revocation of an order of

supervision. *See Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (holding that § 1252(g) precludes judicial review only as to the three areas specifically outlined in the subsection); *see also Zadvydas*, 533 U.S. at 687 (confirming that 28 U.S.C. § 2241 confers jurisdiction on the federal courts to hear cases about the detention of individuals with final removal pending their removal); *J.R. v. Bostock,* No. 2:25-CV-01161-JNW, 2025 WL 1810210, at *3 (W.D. Wash. June 30, 2025) (same as to claims that DHS violated the APA by failing to carry out non-discretionary statutory duties and provide due process to seek withholding of removal).

### B.     Preliminary Injunction

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n. 7 (9th Cir. 2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1) they are "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). The Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*, at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support the issuance of a preliminary injunction where there are "serious questions on the merits … so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Preliminary injunctions are intended to "merely to preserve the relative positions of the parties until a trial on the merits can be held, and to balance the equities at the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. ___, 145 S. Ct. 659, 667 (2025) (citations omitted).

The status quo refers to "the last uncontested status which preceded the pending controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963) (quoting *Westinghouse Elec. Corp. v. Free Sewing Mach. Co*., 256 F.2d 806, 808 (7th Cir. 1958)). In the Court's view, that is the status before Petitioner was arrested and was still on OSUP. *See Kuzmenko v. Phillips,* No. 25-CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10, 2025) (granting a temporary restraining order requiring immediate release of the petitioner back to home confinement from custody, as a restoration of the status quo).

Even if the Court's action here constitutes a mandatory injunction,[11] the evidence supports that action. Mr. Khamba alleges he has suffered and is suffering violations of her substantive and procedural due process rights and that his continued unlawful detention will impose on him and his family serious injury if the injunction does not issue. The injunction issued here is on firm legal footing. As discussed below, due process requires that Petitioner be given timely and meaningful post-deprivation process required by regulation. Because DHS failed to do so and the offered basis for his detention appears to be unsupported, immediate release is appropriate. These injuries are not capable of redress through monetary compensation. Accordingly, injunctive relief is appropriate even under the higher standard for mandatory injunctions.

        1. <u>Likelihood of Success on the Merits</u>

This first factor "is the most important" under *Winter*, and "is especially important when a plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023). Mr. Khamba maintains is detention is unconstitutional because it is "indefinite," violates DHS regulations, and because he was arrested without a pre-deprivation hearing. (*See generally* Doc. 4.)

///

---

[11] "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 879 (9th Cir. 2009) (internal citations omitted). In other words, a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). A mandatory injunction, on the other hand, "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting *Meghrig v. KFC W., Inc*., 516 U.S. 479, 484 (1996)). Although subject to a higher standard, a mandatory injunction is permissible when "extreme or very serious damage will result" that is "not capable of compensation in damages," and the merits of the case are not "doubtful." *Id*. (internal citations and quotation marks omitted).

          a.    *Zadvydas' Reasonable Foreseeability of Removal Standard Does Not Directly Apply Under the Circumstances*

Mr. Khamba appears to argue generally that his detention is unlawful in violation of *Zadvydas* because his removal is not reasonably foreseeable. (Doc. 1 at ¶ 59.) Under the INA, when an individual is subject to a final order of removal, the government ordinarily must secure removal of that individual from the United States within a period of 90 days, known as the "removal period." 8 U.S.C. § 1231(a)(1)(A). The removal period begins on the latest of the following dates: (i) "[t]he date the order of removal becomes administratively final;" (ii) "[i]f the removal order is judicially reviewed and if a court orders a stay of the removal of the [noncitizen], the date of the court's final order;" or (iii) "[i]f the [noncitizen] is detained or confined (except under an immigration process), the date the [noncitizen] is released from detention or confinement." 8 U.S.C. § 1231 (a)(1)(B)(i)-(iii). There is no suggestion in this record that Mr. Khamba's removal order became administratively final within the last 90 days under any of these provisions, so the Court concludes it "became final long ago." *See Alva v. Kaiser*, No. 25-CV-06676-RFL, 2025 WL 2419262, at *3 (N.D. Cal. Aug. 21, 2025) (concluding removal period began when removal order was reinstated).

In general, during the 90-day removal period, the Attorney General "shall detain the alien." 8 U.S.C. § 1231(a)(2)(A). The INA authorizes further detention beyond the removal period under certain circumstances, "including, *inter alia*, those who are removable under 8 U.S.C. § 1227(a)(2) for certain criminal offenses, those determined to be a risk to the community, or those unlikely to comply with the order of removal." *Vaskanyan v. Janecka*, No. 5:25-CV-01475-MRA-AS, 2025 WL 2014208, at *3 (C.D. Cal. June 25, 2025) (citing 8 U.S.C. § 1231(a)(6)).

The Supreme Court set the "presumptively reasonable period of detention" under 8 U.S.C. § 1231(a)(6) at six months. *Zadvydas*, 533 U.S. at 701. After the detention has surpassed the "presumptively reasonable" 6-month period, and "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id*. Additionally, "as

the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink" for detention to remain reasonable. *Id*.

However, the "6-month presumption does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id*. Nor must an alien show that their removal is entirely impossible to receive habeas relief, only that there is no reasonable likelihood of their removal in the foreseeable future. *Id*. at 702. In the Ninth Circuit, "no significant likelihood of removal in the reasonably foreseeable future" means that "the alien must show that he would be unremovable even if the government defeated his petition for review." *Diouf v. Mukasey*, 542 F.3d 1222, 1233 (9th Cir. 2008). In other words, he must be stuck in a "removable-but-unremovable limbo." *Prieto-Romero v. Clark*, 534 F.3d 1053, 1063 (9th Cir. 2008).

Here, Petitioner's *Zadvydas* claim stalls at an early stage because his detention has not approached the presumptively reasonable six-month duration. Though the record vaguely suggests that Mr. Khamba may have been detained in the past, (Doc. 1, ¶ 5 (alleging "ICE opted to release Petitioner" under an OSUP in 2007), and there is some authority indicating that detentions should be measured cumulatively for purposes of *Zadvydas*, *see S.F. v. Bostock*, No. 3:25-CV-01084-MTK, 2025 WL 2841022, at *4 (D. Or. Oct. 7, 2025) ("[F]ederal courts have refrained from applying the presumption of reasonableness under *Zadvydas* in re-detention cases" even where the second detention is less than six months.); *Phong Thanh Nguyen v. Scott*, No. 25-cv-01389, 2025 WL 2419288, at *13 (W.D. Wash. Aug. 21, 2025) ("[T]he six-month period does not reset when the government detains a[ ] [noncitizen] ..., releases him from detention, and then re-detains him again.") (citation omitted), Petitioner does not identify any past periods of detention with specificity and makes no argument about any such detentions here. (*See* Doc. 11 at 9.) Instead, Petitioner argues that detainees may be entitled to release even before the expiration of the six-month period under 8 C.F.R. § 241.13(b), (*id*.), an issue discussed below. Therefore, the Court concludes the *Zadvydas* burden shifting analysis does not directly apply here.

b.     *Violation of Regulations Applicable to Revocation*

Alternatively, Mr. Khamba argues his detention is unlawful because it was in violation of relevant regulations. When an immigrant is placed into parole status after having been detained, a protected liberty interest may arise. *Young v. Harper*, 520 U.S. 143, 147-149 (1997)[12]. The Due Process Clause may protect this liberty interest even where a statute allows the immigrant's arrest and detention and does not provide for procedural protections. *Id.* (Due Process requires pre-deprivation hearing before revocation of preparole); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). *Morrissey* observed that parole allows the parolee to enjoy the same activities as those who have not been arrested and held in custody including, living at home, having a job, and "be[ing] with family and friends and to form the other enduring attachments of normal life." *Morrissey*, 408 U.S. at 482. "Though the [government] properly subjects [the parolee] to many restrictions not applicable to other citizens," such as monitoring and seeking authorization to work and travel, "his condition is very different from that of confinement in a prison." *Id.* "The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id.* The revocation of parole undoubtedly "inflicts a grievous loss on the parolee." *Id.* (quotations omitted). Therefore, a parolee possesses a protected liberty interest in their "continued liberty." *Id.* at 481–84.

DHS's failure to follow its own procedural regulations may constitute a due process violation. *Zhu v. Genalo*, No. 1:25-CV-06523 (JLR), 2025 WL 2452352, at *6–7 (S.D.N.Y. Aug. 26, 2025) (noting that the government admitted in that case that the petitioner has a due process right to the procedures set forth in § 241.4, though it contested which procedures applied to him). As *Zhu* explained, "[t]he Government has significant discretion to enforce the immigration laws and, indeed, to revoke [an] Order of Supervision. . . But it must do so consistent with the requirements of its own regulations and the Due Process Clause." *Id.*; *see also Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 157 (W.D.N.Y. 2025) ("[T]he mere fact that the government has the authority to detain someone does not mean that it may do so in any manner it chooses,

---

[12] In *J.G.G.*, the Supreme Court re-affirmed that aliens are entitled to due process of law in deportation proceedings and must be given notice and an opportunity to be heard commensurate with the nature of the case. *Trump v. J. G. G.*, 604 U.S. ___, 145 S. Ct. 1003, 1006 (2025).

without affording due process.").

As mentioned, it is undisputed that Mr. Khamba is subject to an order of removal that became final many years ago. When, as is the case here, a noncitizen does not leave or is not removed within the 90-day removal period, the individual, "pending removal, shall be subject to supervision." 8 U.S.C. § 1231(a)(3). "As mandated by Congress, the default status after the 90-day removal period is therefore release on conditions, not detention." *Alva*, 2025 WL 2419262, at *3. Noncitizens subject to a removal order may be released pursuant to 8 C.F.R. § 241.4 or 8 C.F.R. § 241.13. *See Ceesay*, 781 F. Supp. 3d at 154. Once released, those same regulations also govern revocation of release.

Petitioner (Doc. 1, ¶ 42) and Respondent (Doc. 9, at 2) agree that 8 C.F.R. § 241.13 applies here, which provides "special review procedures for those aliens who are subject to a final order of removal and are detained under the custody review procedures provided at [8 C.F.R. § 241.4] after the expiration of the removal period, where the alien has provided good reason to believe there is no significant likelihood of removal to the country to which he or she was ordered removed, or to a third country, in the reasonably foreseeable future." *Id.*, § 241.13(a). If DHS determines there is no significant likelihood of removal, DHS must "promptly make arrangements for the release of the alien subject to appropriate conditions" unless "there are special circumstances justifying continued detention." *Id.*, § 241.13(g)(1). However, if DHS "subsequently determines, because of a change of circumstances, that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future to the country to which the alien was ordered removed or to a third country, the alien shall again be subject to the custody review procedures under 8 C.F.R. 241.4." 8 C.F.R. § 241.4(b)(4).

If § 241.4 is triggered, it sets forth the procedures for revocation of supervision:

> (1) Violation of conditions of release. Any alien described in paragraph (a) or (b)(1) of this section who has been released under an order of supervision or other conditions of release who violates the conditions of release may be returned to custody. Any such alien who violates the conditions of an order of supervision is subject to the penalties described in section 243(b) of the Act. **Upon revocation, the alien will be notified of the reasons for revocation of his or her release or parole. The alien will be afforded an initial informal interview promptly after his or her return to Service**

13

>**custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification.**
>
>(2) Determination by the Service. **The Executive Associate Commissioner shall have authority, in the exercise of discretion, to revoke release and return to Service custody an alien previously approved for release under the procedures in this section**. A district director may also revoke release of an alien when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner. **Release may be revoked in the exercise of discretion when, in the opinion of the revoking official:**
>
>>(i) The purposes of release have been served;
>>
>>(ii) The alien violates any condition of release;
>>
>>**(iii) It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or**
>>
>>(iv) The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

8 C.F.R. § 241.4(l)(emphasis added)).[13]

Respondents do not suggest that Mr. Khamba violated the terms of his supervision; rather, they appear to suggest that 8 C.F.R. § 241.4(b)(4) applies because of "changed circumstances regarding the reasonable foreseeability of removal." (Doc. 9 at 2.) Nothing in this record suggests Mr. Khamba was afforded the post-deprivation procedural protections of § 241.4 at any point since August 29, 2025. In other words, DHS did not provide him with notice of the reasons for revocation of his release "upon revocation" or "promptly" provide him with an informal interview to afford him an opportunity to respond to any such justification.

DHS may not exercise its discretion in a manner that is inconsistent with constitutional requirements. As the *M.S.L.* court explained:

>Government agencies are required to follow their own regulations.

---

[13] Though DHS has asserted in other litigation that the notice requirements set forth in 8 C.F.R. § 241.4(l)(1) do not constrain revocation of release pursuant to § 241.4(l)(2), several district courts have rejected that argument. *See, e.g.*, *Ceesay*, 781 F. Supp. 3d at 163–4 & n. 25 (finding this argument "does not make sense" because paragraph (l)(2)(ii) includes violations of supervised release "as one of the possible reasons for revoking release" and requiring procedures of notice and an interview "regardless of the reason for the revocation"); *Zhu v. Genalo*, No. 1:25-CV-06523 (JLR), 2025 WL 2452352, at *6–7 (S.D.N.Y. Aug. 26, 2025) (finding such an interpretation would " result in imbalanced procedural safeguards for noncitizens redetained under section 241.4" because "noncitizens who are redetained because they violated the terms of supervision" would be entitled to more process than those who have met their obligations to report). The Court agrees with those decisions that the notice and interview requirements apply to anyone whose supervision has been revoked pursuant to 8 C.F.R. § 241.4(l)(1) or (2).

> *United States ex rel Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003). Courts have found that when ICE fails to follow its own regulations in revoking release, the detention is unlawful and the petitioner's release must be ordered. *See Ceesay*, 2025 WL 1284720, at *20-21; *Rombot v. Souza*, 296 F. Supp.3d 383, 387 (D. Mass. 2017). More fundamentally, ICE's failure to provide Petitioner with a timely Notice of Revocation or conduct an informal interview until nearly a month after taking her into custody is a grave violation of Petitioner's due process rights in that they deprived her both of meaningful notice and an opportunity to be heard.

*Id*. at *11–*12.

*Perez-Escobar v. Moniz*, No. 25-CV-11781-PBS, 2025 WL 2084102, at *2 (D. Mass. July 24, 2025), addressed a somewhat similar situation where an alien's release was revoked pursuant to 8 C.F.R. 241.4(l). Perez received a Notice of Revocation of Release, stating generically that officials had reviewed his "official alien file" and determined "there are changed circumstances in your case," including that "there is a significant likelihood of removal in the reasonably foreseeable future" and that DHS "determined the purpose of your release has been served and it is appropriate to enforce the removal order." *Id*. at *1. This notice was deemed insufficient for purposes of the regulation and due process. *Id*. at *2. Considering the insufficient notice, the petitioner was ordered released. *Id*. The *Perez* court reasoned:

> "[T]he essential requirements of procedural due process include adequate notice and an opportunity to be heard '**at a meaningful time and in a meaningful manner**.'" *Aponte-Rosario v. Acevedo-Vila*, 617 F.3d 1, 9 (1st Cir. 2010) (quoting *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990)); *see Jimenez v. Cronen*, 317 F. Supp. 3d 626, 634 (D. Mass. 2018) (explaining that the "[f]undamental features of procedural due process are fair notice of the reasons for the possible loss of liberty and a meaningful opportunity to address them"). Likewise, under DHS's regulation, "in order to revoke conditional release, the Government must provide adequate notice" and give the noncitizen "an opportunity to respond to the reasons" offered for the revocation. *Noem v. Abrego Garcia*, ––– U.S. –––, 145 S. Ct. 1017, 1019 (2025) (statement of Sotomayor, J.) (quoting 8 C.F.R. § 241.4(*l*))(1). ICE's conclusory explanation for revoking Petitioner's release did not offer him adequate notice of the basis for the revocation decision such that he could meaningfully respond at the post-detention "informal interview." 8 C.F.R. § 241.4(*l*)(1); *see Mard v. Town of Amherst*, 350 F.3d 184, 189 (1st Cir. 2003) (explaining that "[t]he purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for," the opportunity to be heard (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14 (1978))).

15

*Perez*, 2025 WL 2084102 at *2 (emphasis added); *see also M.S.L. v. Bostock,* No. 6:25-CV-01204-AA, 2025 WL 2430267, at *8–9 (D. Or. Aug. 21, 2025) (where petitioner was initially told her release was revoked because there is a significant likelihood of removal in the reasonably foreseeable future, but that rationale was later withdrawn and replaced by the assertion that she violated the terms of her OSUP, the court ordered immediate release because revocation decision was "arbitrary" and ICE acted unlawfully by failing to timely follow procedures of § 241.4(l)(1)). Similarly, *Zhu* concerned a Chinese national who was detained in 2018 but released because of China's unwillingness to accept deportees. 2025 WL 2452352, at *1. His supervision was cancelled without any notice or explanation in August of 2025, and he was not given a post-deprivation interview. *Id*. Even though the government represented to the court in its briefing that "since January 2025, China has accepted citizens who were removed from the United States and that ICE [was] currently working to obtain travel documents to effectuate [Zhu's] removal to China," *id*. *2, Zhu was ordered released because he "received no process before being redetained, in violation of ICE's own regulations and the Due Process Clause." *Id*. at *9.

However, *Douglas v. Baker*, No. 25-CV-2243-ABA, 2025 WL 2687354 (D. Md. Sept. 19, 2025), stopped short of ordering immediate release for a detainee where the foreseeability of removal was unclear but at least appeared to be possible and supported by evidence. There, Douglas, a citizen of Jamaica who had been living in the United States for several decades, was subject to a final order of removal to Jamaica that was withheld pursuant to the Convention Against Torture. *Id*. at *1. He was released on OSUP and complied with all conditions of release. *Id*. In July 2025, he appeared for an appointment but was re-detained by ICE. *Id*. At that time, he was provided a Notice of Revocation of Release that indicated that his "case is under current review by [the] United Kingdom for the issuance of a travel document," as well as a "Notice of Removal" that also warned him of removal to the United Kingdom. *Id*. at *1–2. In the context of his *Zadvydas* claim, Douglas argued that "removal to the U.K. is unlikely both because the U.K. is unlikely to authorize the U.S. to send him there and because the U.K. is unlikely to commit to not repatriating him to Jamaica." *Id*. at *3. But, though recognizing there was "substantial uncertainty" about his removal, the government had responded with evidence the *Douglas* court

found sufficient to rebut that showing. *Id.* As to Douglas' claim that his detention violated 8 C.F.R. §§ 241.4(l) and/or 241.13, the court concluded that Douglas had not shown that any such violations would "independently entitle" him to release from detention because the government revoked his supervised released based upon a determination that it is appropriate to enforce a removal order within the meaning of 8 C.F.R § 241.4(l)(2)(iii). *Id.* at *5. However, Douglas was entitled to additional process because the government failed to conduct the informal interview required by 8 C.F.R. § 241.13(i)(3). As *Douglas* explained:

> [Section] 241.4(g)(4) operates in parallel with § 241.4(l). [U]nder § 241.4(g)(4), a "custody review" need not be conducted if "it is *ready to execute* an order of removal." 8 C.F.R. § 241.4(g)(4) (emphasis added). The "informal interview" required by § 241.4(l) is different. That procedure ensures that when a noncitizen's release has been revoked, the noncitizen has notice and an opportunity to be heard regarding the basis for the revocation of release.

*Id.* at *6. Nothing in the *Douglas* record excused ICE from conducting the informal interview when it revoked his conditions of supervised release, so the interview was ordered to take place. *Id*.

On the present record, this case is more like *Perez* and *Zhu* than *Douglas*. Unlike *Douglas*, Mr. Khamba was not afforded appropriate notice at the time of his revocation. Though DHS now asserts that his removal is likely to be secured within the coming weeks as a result of an application for travel documents submitted weeks after his arrest, this justification was not presented to Mr. Khamba at the time of his arrest on August 29, 2025, but instead was offered post hoc in a declaration filed on September 24, 2025. (Doc. 9-1.) Moreover, Petitioner has offered evidence to suggest his removal to India is *not* reasonably foreseeable. Not only has DHS been unable to secure travel documents for him for 20 years, Petitioner asserts that obtaining such documents is "nothing but a pipe dream" because India is a "recalcitrant" country.[14] Finally, DHS has yet to offer Mr. Khamba a post-deprivation interview of any kind. Thus, he is likely to succeed on his due process claim in part, at least.[15]

---

[14] *See* Doc. 11 at 8 (citing "'Recalcitrant' and 'Uncooperative': Why Some Countries Refuse to Accept Return of Their Deportees," Migration Policy Institute (Dec. 20, 2022), https://www.migrationpolicy.org/article/recalcitrantuncooperative-countries-refuse-deportation).

[15] The Court declines to address Petitioner's other claims at this time. For example, he requests an injunction against

2.  Irreparable Harm

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 247, 272 (1976)). Moreover, "[t]he Ninth Circuit has recognized 'irreparable harms imposed on anyone subject to immigration detention' including 'the economic burdens imposed on detainees and their families as a result of detention.'" *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970 (9th Cir. 2011) (the inability to pursue a petition for review may constitute irreparable harm). The evidence here demonstrates that Mr. Khamba's family is suffering because of his absence and that he has made a significant positive imprint on his community during his time on release.

3.  Balance of the Harms/Public Interest

Because the interest of the government is the interest of the public, the final two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court agrees by analogy with the analysis of *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025), and finds it correctly addresses the situation here:

> "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." [*Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021)] (cleaned up) (quoting *Ortiz Vargas*, 2020 WL 5074312, at *4, and then quoting *Hernandez*, 872 F.3d at 996; see also *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). Without the requested injunctive relief, Petitioner-Plaintiff faces the danger of significant health consequences and deprivation of her liberty. Yet the comparative harm potentially imposed on Respondents-Defendants is minimal—a mere short delay in detaining Petitioner-Plaintiff, should the government ultimately show that detention is intended and warranted. Moreover, a party "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).

---

third country removal without certain procedural protections (Doc. 4 at 28), but any such fear is speculative. He does not allege any specific threat of third country removal and the only rationale provided by Respondent for a changed circumstance is that Mr. Khamba's deportation to India is reasonably foreseeable.

In addition, there appears to be no dispute that there is no evidence that Mr. Khamba poses a risk of flight or a danger to the community. For these reasons and those set forth in *Pinchi*, the Court concludes that the balance of the equities and public interest weigh in favor of Mr. Khamba.

## CONCLUSION AND ORDER

For the foregoing reasons, the Court **ORDERS:**

1. Petitioner's Motion for Temporary Restraining Order (Doc. 4) is converted to a Motion for Preliminary Injunction, and it is **GRANTED IN P ART**.

2. **<u>Before</u>** Petitioner may be re-detained, DHS must be able to demonstrate a change of circumstances that would justify his detention. DHS must follow the procedures set forth in § 241.4(l)(1) as detailed above, including providing notice to Petitioner of the specific facts giving rise to a change of circumstances. Then, DHS must provide Petitioner a post-deprivation hearing within reasonable time, not to exceed seven days, at which Petitioner will have the opportunity to be heard.

3. Petitioner may file a further brief on the merits of the habeas petition within 30 days or may notify the Court that no further briefing will be filed. If Petitioner files an additional brief, the government may file a further brief within 30 days thereafter. The Petitioner may file a reply brief within 14 days of the government filing its brief.

IT IS SO ORDERED.

Dated:   **October 17, 2025**

UNITED STATES DISTRICT JUDGE